AO 106 (Rev. 04/10) Application for a Search Warrant

AUTHORIZED AND APPROVED/DATE: Drew Davis 9/28/2026

9/28/26 afm

# UNITED STATES DISTRICT COURT

for the

Western District of Oklahoma

FILED
SEP 28 2026
JOAN KANE, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY ___ , DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

an Orange Apple iPhone 17 Pro Max, with a clear and white Zagg case, and a Blue Apple iPhone with a black OtterBox case, unknown IMEI numbers, currently located at 901 NE 122nd St., Oklahoma City, Oklahoma

Case No. M-26-476-ALM

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the Western District District of Oklahoma , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 846 | Drug Conspiracy |
| 18 U.S.C. § 1956(h) | Money Laundering Conspiracy |

The application is based on these facts:

See affidavit of DEA Special Agent Jeremy Epp.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: __________ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

JEREMY EPP, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/28/26

*Judge's signature*

City and state: Oklahoma City, Oklahoma

AMANDA L. MAXFIELD, U.S. Magistrate Judge
*Printed name and title*

**THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **AN ORANGE APPLE IPHONE 17 PRO MAX WITH A CLEAR AND WHITE ZAGG CASE AND A BLUE APPLE IPHONE WITH A BLACK OTTERBOX CASE LOCATED WITHIN THE WESTERN DISTRICT OF OKLAHOMA** | **Case No. M-26- -ALM** |

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

I, Jeremy Epp, Special Agent (SA) of the Drug Enforcement Administration (DEA), being duly sworn, depose and state as follows:

1. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7) and am empowered by law to conduct investigations of and to make arrests for offenses as set forth in 18 U.S.C. § 2516.

2. I have been a Special Agent with the DEA since January 2018 but have been employed by DEA since August of 2017. Prior to my time at DEA, I was a police officer with Friendswood Police Department Patrol Division for approximately eight years in Friendswood, Texas. During my time on patrol, I worked closely with the Friendswood Police Department's Narcotics Unit before leaving law enforcement for two years. In August 2017, I was hired by the DEA and attended the five-month academy in Quantico, Virginia. In

April 2018, I was assigned to the DEA Oklahoma City Office. I have participated in investigations that have resulted in the seizure of large amounts of heroin, cocaine, methamphetamine, marijuana, as well as the seizures of narcotics proceeds and assets derived from the sale of narcotics. I am familiar with, and have participated in, several methods of investigation, including, but not limited to: visual surveillance, interviews of witnesses, search warrants, the utilization of undercover agents, as well as Title III wires.

3. The information contained in this Affidavit is submitted for the limited purpose of establishing probable cause to secure a search warrant for two cellular devices: (1) **an orange Apple iPhone 17 Pro Max with a clear and white ZAGG iPhone case, bearing an unknown International Mobile Equipment Identity (IMEI) number**; and (2) **a blue Apple iPhone with a black OtterBox case, bearing an unknown IMEI number** (hereinafter, the "**Subject Devices**"), as further described in **Attachment A** (physical description), for evidence of a violation of 21 U.S.C. § 846 (drug conspiracy) and 18 U.S.C. § 1956(h) (money laundering conspiracy), as further described in **Attachment B** (description of items to be seized).[1] The

---

1 There are no visible serial numbers or identifiers on the outside of the **Subject Devices**, and there is not a removable SIM card for either device. Therefore, law enforcement is unable to provide further specificity and must rely on the physical description of the **Subject Devices** in this Affidavit and associated documents.

**Subject Devices** are currently located in secure evidence storage at the DEA Oklahoma City office, within the Western District of Oklahoma.

4. Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only the facts I believe are necessary to establish probable cause for the requested warrant.

## PROBABLE CAUSE

5. Law enforcement first became aware of Li Shun Chen (CHEN) and the drug trafficking organization (the "DTO") described herein in March 2024, when a cooperating source (CS-1) set up a controlled purchase of marijuana, and CHEN ultimately delivered the marijuana. Following that transaction, DEA and the Oklahoma Bureau of Narcotics and Dangerous Drugs (OBN) began a joint investigation into this DTO, specializing in cross-country distribution of marijuana, and money laundering. DEA agents identified CHEN and **Hong Tao Zhang (ZHANG)** as the primary brokers for the Oklahoma City side of the operation, and Ying Wang (WANG) as the primary courier between grows and the DTO who reported to CHEN. Law enforcement was able to confirm that the DTO used cellphones, apps on cellphones, and computers to conduct their illicit drug business. DEA agents also determined during the T-III, **ZHANG** was using at least two different phone numbers prior to locating two cellphones believed to be **ZHANG's** during his arrest.

6. Since the passage of Oklahoma's Medical Marijuana laws, law enforcement has seen a tremendous increase in black market marijuana trafficking activity and a particular increase in drug trafficking activity connected to Chinese-backed money laundering organizations. In my training and experience, these organizations follow the same general patterns. The DTO will control or have relationships with marijuana grows throughout the state. The DTO will pick-up black-market marijuana from these grows, that is marijuana sold outside of Oklahoma's Medical Marijuana regime, and in violation of both Oklahoma state law and federal law. This black-market marijuana is often stored at one or more main stash house locations in the Oklahoma City area. Secondary distribution stash houses are maintained by the DTO which are primarily used to distribute black market marijuana to customers.

7. DEA agents determined that the DTO followed this same general pattern using CHEN and **ZHANG** as brokers who were responsible for coordinating the marijuana sales with customers. Throughout the investigation, law enforcement observed CHEN and **ZHANG** using multiple stash houses to meet with marijuana customers. Often, CHEN would contact **ZHANG** who had remote access to at least the garage door at the stash house locations and allow individuals inside when he was not present.

*The Tous les Jours Bakery*

8. On or about April 20, 2024, the Tous les Jours bakery opened a franchised location in Oklahoma City, Oklahoma. During the course of this investigation, DEA agents were able to determine from an attachment submitted to the Oklahoma Secretary of State on May 18, 2023, that **ZHANG** was a shareholder of Tous les Jours.

a. On February 7, 2024, a bank account associated with the Tous les Jours bakery received a $20,000 wire through Emprise Bank in Wichita, Kansas, from KW ROCK HAULERS LLC, with **ZHANG** as the registered owner.

b. Leading up to the opening of the Tous les Jours, from June 2023 to April 2024, the associated account received additional deposits totaling over $400,000, primarily through in-bank deposits, wires, and mobile check deposits $10,000 or larger.

c. Between April 22 and April 30, 2024, the associated account received a total of $101,707.17 in deposits. These deposits were completed through merchant services, and their origins are not shown. However, to generate this much revenue, the bakery would have had to have averaged over 38 customers for every hour it was open from April 19 to April 30 (assuming the restaurant was open eleven hours per day, every day, consistent with the current schedule advertised online), with each customer spending on average $20.

d. The first full month the bakery was open, May 2024, the associated account received $311,199.83 in deposits. The following checks were written from the account and dated June 4, 2024:

   i. $24,000 paid to the order of Danny Liu, no memo

   ii. $12,000 paid to the order of Hua Chen [H. CHEN] for "Return of capitals"

   iii. $16,000 paid to the order of **ZHANG**, no memo

iv. $4,000 paid to the order of Cai Xiang Li for "Return of capitals"

v. $4,000 paid to the order of Zhi Qiang Liu for "Return of capitals[.]"

***The Title III Wiretap***

9. On January 2, 2026, United States District Judge David L. Russell for the Western District of Oklahoma, issued an order—the Government's application for which named CHEN, JIANG, and others as "Target Subjects"—authorizing the interception, monitoring, and recording of wire communications occurring over CHEN's cellular device (405) 503-8118 (TT1).

10. Throughout the interception of TT1, agents noticed that CHEN talked to many individuals involved in different aspects of the overall conspiracy. Law enforcement determined, based on the intercepted conversations, that CHEN talked to several individuals who were also marijuana brokers, or in some instances, marijuana farmers, in order to acquire the bulk marijuana he sold. Intercepted calls indicated that **ZHANG** was one of these individuals. CHEN routinely talked about pricing or acquiring marijuana with **ZHANG**. CHEN also communicated directly with multiple customers, including out-of-state customers, to set up deals. Intercepted calls indicated that the customers of the DTO traveled themselves, or would send someone, to a location set by CHEN to pick up marijuana. Most of CHEN's conversations with those individuals revolved around setting up a time and location to sample marijuana and then setting up a time and

location for the individual to pick up marijuana. It appeared, based on the investigation, that the bulk marijuana was normally delivered to a stash house via a courier between the farms and CHEN. Intercepted calls showed that CHEN also coordinated drop offs, with co-conspirators like WANG, and previously JIANG.

*Stash House Found by Police*

11. On January 23, 2026, DEA agents were conducting surveillance and observed a locksmith, landlord and Oklahoma City Police Department (OCPD) officer arrive at the DTO's primary Oklahoma City stash house at the time, 2305 NW 162nd Street, Oklahoma City, Oklahoma.[2] At 2:22 p.m., CHEN called **ZHANG** and asked **ZHANG** why the warehouse had police there, in reference to their stash house. **ZHANG** asked if it was "our warehouse," and CHEN replied, "yes, take a look."[3] **ZHANG** complained that there were over "100 pieces," and that he was "screwed now." CHEN responded that it was "okay, it will be taken away for sure" and told **ZHANG** not to worry. Three minutes later, **ZHANG** called CHEN and told him to "delete everything."

---

[2] This event was not a part of the DEA investigation or initiated by any individual that had knowledge of the investigation.

[3] I know, through my knowledge of the investigation, that CHEN and **ZHANG** often had security cameras installed at their stash houses.

CHEN responded that he already had. When **ZHANG** asked where CHEN kept "them," CHEN assured him that if the police went in, the "stuff" was "all gone." **ZHANG** then stated that "it's too often is the problem" and asked who made the "switch."[4]

12. CHEN subsequently called HE and told her to go to "Lin Ming's" place. When HE asked if the warehouse lost anything, CHEN told her to take the money from the bakery to "Lin Ming" and to call **ZHANG** and LIU. HE agreed. About five minutes later, CHEN called HE again and told HE to ask an unnamed individual to come and get the bakery money. About ten minutes after that call, CHEN called HE again and asked if she was at "Lin Ming's" yet. HE responded, "no," because she had to go to the bakery first. CHEN told HE to bring the "bookkeeping" as well.

13. Based on my training, experience, and knowledge of the investigation, I believed that DTO members were utilizing the Tous les Jours to store and launder proceeds from the drug conspiracy, and that one of their first priorities when they felt they might be caught was to instruct HE to get the money and records from Tous les Jours and take them someplace safe.

---

4 This comment is consistent with a prior intercepted conversation where CHEN and **ZHANG** strategized how to avoid suspicion when customers came to the stash house to pick up marijuana. They noted in that conversation that cars coming too often made people suspicious.

14. On February 4, 2026, United States District Judge David L. Russell for the Western District of Oklahoma, issued an order—the Government's application for which named CHEN, WANG, **ZHANG**, and others as "Target Subjects"—authorizing, in part, the continued interception, monitoring, and recording of wire communications occurring over CHEN's cellular device (405) 503-8118 (TT1).

*Transaction in Wichita, Kansas*

15. On March 1, 2026, at approximately 11:47 a.m., DEA intercepted an outgoing call from CHEN, using TT1, to **ZHANG**, using (660) 207-8170. Below is a summary of the transcribed call, which was transcribed from Fujianese to English.

CHEN: "Hua Xing will be there at 1 o'clock"

**ZHANG**: "Is it 57k?"

CHEN: "It is five units."

16. At approximately 12:29 p.m. the same day, DEA intercepted an incoming phone call between CHEN, using TT1, and **ZHANG**, using (660) 207-8170, which was translated from Fujianese to English. During the call **ZHANG** told CHEN to tell Hua Xin to delay 30 minutes so that he could eat.

17. At approximately 1:21 p.m. the same day, DEA intercepted an incoming call between CHEN, using TT1, and **ZHANG**, using (660) 207-8170, which was transcribed from Fujianese to English. During the call **ZHANG** told

CHEN that he was going to meet Hua XIN, and that he would let CHEN know when the stuff arrived.

18. At approximately 1:35 p.m. the same day, DEA agents in Wichita, Kansas, observed who was believed to be **ZHANG**, in his Honda Civic, enter the lot of the Super East Buffet located at 7607 E Douglas Ave, Wichita, Kansas. DEA agents then witnessed an unidentified male exit a Dodge Ram and approach the open driver's side window of **ZHANG**'s Honda Civic. The unidentified male then walked back to the Dodge Ram carrying a paper grocery bag. The unidentified male then entered the driver's seat of the Dodge Ram, and both the Dodge Ram and **ZHANG** subsequently left the parking lot.

19. About five minutes later, at approximately 1:40 p.m., DEA intercepted an incoming call between CHEN, using TT1, and **ZHANG**, using (660) 207-8170, which was transcribed from Fujianese to English. During the call **ZHANG** told CHEN that he had just given five units to Hua Xing.

20. Based on my training and experience, it appeared that CHEN directed **ZHANG** to deliver $50,000 dollars to Hua Xing at 1:00 p.m., and that the transaction took place at about 1:30 p.m. in a parking lot in Wichita, Kansas. DEA agents determined that the individual driving the Dodge Ram that **ZHANG** met with was associated with an illicit marijuana grow—DIHOW LLC—located at 19701 W South Avenue, Tonkawa, Oklahoma. Also, during the same day, CHEN

and **ZHANG** spoke about CHEN meeting a marijuana customer who was picking up.

21. On April 21, 2026, **ZHANG** and numerous other co-defendants were indicted by a federal grand jury for a drug conspiracy and other drug-related charges. *See United States v. Li Shun Chen, et al.*, W.D.O.K. Case No. CR-26-177-D, Doc. 1.

*The Takedown*

22. On April 23, 2026, DEA agents, with the assistance of other federal and state agencies, conducted a large-scale takedown involving the service of multiple search warrants. During the takedown, the Oklahoma City Police Department (OCPD) conducted a traffic stop on a grey BMW X5, bearing Kansas License Plate "830-PTX" registered to Weijing LIU. During the traffic stop **ZHANG** was located in the back passenger seat. Investigators located approximately $8,803 in U.S. currency in **ZHANG**'s back right pants pocket. Law enforcement also found two cellphones on **ZHANG's** person: (1) **an orange Apple iPhone 17 Pro Max**; and (2) **a blue Apple iPhone in a black case.** Both phones are believed to be phones used by **ZHANG** during the interception of TT-1.[5]

[5] **ZHANG** was intercepted on TT1 using (660) 207-8170 and (316) 258-9870, which was confirmed by the T-III monitors when **ZHANG** told CHEN, "I'm on the other phone with Ah Shou and Sister-in-law KUA on the phone." On

23. On April 23, 2026, DEA Tulsa, ATF Oklahoma City, IRS-CI Oklahoma City, and Oklahoma Highway Patrol served a search warrant at the Tous les Jours. DEA Tulsa personnel located a computer on a desk in the Tous les Jours office that, when opened, showed a user login screen for "danny liu."

24. Investigators further discovered a calendar in the office spanning from July 2025 through April 2026. The calendar included multiple annotations referencing known members of the DTO.

a. A sticky note on January 2026 read, "Hong – 34k." I believe this was a reference to **ZHANG** and $34,000.

b. A note on March 2026 read "Mixue – 126.75 hr @ 18 = 2781.50." "Mi Xue" was identified as HE's nickname during the interception of TT1. An additional annotation for March 2026 states, "Danny tooked $2046.60 from old account to pay Insurance for Tulsa needs to pay back to account." I believe this indicated Danny LIU was assisting the DTO in setting up their second Tous les Jours location in Tulsa.

c. A sticky note on April 2026 read, "4/7 Ah Sou $530 [illegible]." "Ah Shou" was identified as R. ZHENG's nickname during the interception of TT1.

---

February 26, 2026, at approximately 11:00pm, CHEN placed an outgoing call to (316) 258-9870, which was determined by voice analysis to be **ZHANG**. During the interception of TT1, **ZHANG** used (660) 207-8170 to talk to CHEN about illicit marijuana business and opening the garage door to the stash locations regularly. DEA agents determined the Financial Liable Party for (316) 258-9870 was Iasiah ZHANG but showed the user of the phone as **Hong ZHANG** using his address at 317 N Clay Circle, Wichita, Kansas.

25. Additional paperwork in the bakery included what appeared to be handwritten accounting records. Many of these records were consistent with bank account records associated with an account for the bakery. For example, the handwritten records included the entry, "check out (esstech.) 23240 3/17" under "March 2025." The Tous les Jours bank account showed that a $23,240.00 check was written to "ESS Technologies USA Inc." on March 17, 2025. However, other handwritten records were not reflected in the bank account, specifically the following entries:

a. March 2025: "Divendend 100k cash out 3/29";

b. May 2025: "5/21 100,000 cash out (27170 check, 40k cash, 32830 c/o);

c. July 2025: "7/20 c/o 80k cash";

d. September 2025: "9/13 Dividends. (20k check, 60k cash Total 80k); and

e. November 2025: "11/10 80k Dividends (50k cash, 30k check)."

26. As detailed above, multiple dividend checks were written to shareholders in the bakery from the Tous les Jours bank account. However, none of the dividend checks added up to the amounts listed in the handwritten records for any given month.

27. The documents in the office also included several hand-filled business income and expenditure tables signed by Danny LIU.

28. Based on the foregoing, I believe Danny LIU was involved in operating the Tous les Jours for the DTO and assisted in laundering drug proceeds through the business, as well as paying laundered proceeds as dividends to members through checks and cash.

29. Based on conversations between CHEN and **ZHANG** throughout the interception of TT1, I believe information related to a drug conspiracy and money laundering conspiracy will be located on the **Subject Devices**. Further, I believe that information contained within the **Subject Devices** will provide information regarding the structure of the DTO and will help investigators identify and confirm ways the organization laundered U.S. currency.

30. Based on my training and experience, I know that possession of marijuana in the amount seized by law enforcement during this investigation—more than 1,000 pounds—is inconsistent with personal use and intended for distribution. Phone calls between CHEN and **ZHANG** verified they were distributing large amounts of marijuana to individuals traveling from out of state. Moreover, **ZHANG** had the **Subject Devices** in his possession incident to his arrest after an arrest warrant was issued for his involvement in trafficking marijuana.

31. Based upon my training and experience, I am aware that individuals involved in trafficking illegal narcotics and laundering money often use cellphones and other similar electronic devices, such as tablets, to maintain

contact with other co-conspirators, including: suppliers, transporters, distributors, and purchasers of illegal narcotics. Such devices and their associated memory cards commonly contain electronically stored information which constitutes evidence, fruits, and instrumentalities of drug trafficking and money laundering offenses including, but not limited to: the phone directory and/or contacts list, calendar, text messages, e-mail messages, call logs, photographs, and videos. Based upon my training and experience, I know that most drug trafficking—and particularly high-level drug trafficking—is coordinated via cellphones and similar electronic devices. Conspirators often use cellphones to make requests for drug purchases, provide information on price, and set up places to meet for transactions.

32. The **Subject Devices** are currently located in secure evidence storage at the DEA Oklahoma City District Office. Based on my training and experience, I know that the **Subject Devices** have been stored in a manner in which their contents are (to the extent material to this investigation) in substantially the same state as they were when the **Subject Devices** first came into the possession of DEA Oklahoma City.

33. Accordingly, based on the aforementioned facts, there is probable cause to believe that the **Subject Devices** contain evidence of a federal crime—namely, drug conspiracy in violation of 21 U.S.C. § 846, and money

laundering conspiracy in violation of 18 U.S.C. § 1956(h)—within the Western District of Oklahoma, and elsewhere.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

34. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

35. *Forensic evidence.* As further described in **Attachment B**, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crime described in the warrant, but also forensic evidence that establishes how the **Subject Devices** were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Subject Devices** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on the **Subject Devices** is evidence may depend on other information stored on the **Subject Devices** and the application of knowledge about how the **Subject Devices** operate. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

36. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which I am applying would permit the examination of the **Subject Devices** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

37. *Manner of execution.* Because this warrant seeks permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently,

I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night and request permission to do so.

## CONCLUSION

38. Based on the aforementioned facts, I submit that there is probable cause to believe that a violation of 21 U.S.C. § 846 (drug conspiracy) and 18 U.S.C. § 1956(h) (money laundering conspiracy) has occurred, and that evidence, fruits, and instrumentalities of these offenses are located on the **Subject Devices**. Therefore, I respectfully request that the Court issue a search warrant authorizing the search of the **Subject Devices** described in **Attachment A** to seize the items described in **Attachment B**.

JEREMY EPP
Special Agent,
Drug Enforcement Administration (DEA)

SUBSCRIBED AND SWORN to before me this 28th day of September 2026.

Amanda L Maxfield
AMANDA L. MAXFIELD
United States Magistrate Judge
Western District of Oklahoma

## ATTACHMENT A

The property to be searched is:

1. an orange Apple iPhone 17 Pro Max with a clear and white ZAGG iPhone case, bearing an unknown International Mobile Equipment Identity (IMEI) number, seized from **Hong ZHANG**; and

2. a blue Apple iPhone with a black OtterBox case, bearing an unknown International Mobile Equipment Identity (IMEI) number, seized from **Hong ZHANG**;

(hereinafter, the "**Subject Devices**").

The **Subject Devices** are currently in possession of the DEA located at 901 NE 122nd St, Oklahoma City, Oklahoma 73114, within the Western District of Oklahoma, and are shown below in photographs.





**1.** An orange Apple iPhone 17 Pro Max with a clear and white ZAGG iPhone case, bearing an unknown International Mobile Equipment Identity (IMEI) number, seized from **Hong ZHANG** (pictured directly above).







**2.** A blue Apple iPhone with a black OtterBox case, bearing an unknown International Mobile Equipment Identity (IMEI) number, seized from **Hong ZHANG** (pictured directly above).

# ATTACHMENT B

## LIST OF ITEMS TO BE SEIZED

1. All records on the **Subject Devices**, described in **Attachment A**, that relate to a violation of 21 U.S.C. § 846, drug conspiracy, and 18 U.S.C. § 1956(h), money laundering conspiracy, occurring between March 1, 2024, and April 23, 2026, including:

a. information recording **Hong ZHANG's** involvement in the illicit marijuana business and his money laundering practices;

b. lists of customers and co-conspirators, and related identifying information including images, videos, and audio recordings;

c. records of communications with customers, co-conspirators, or others regarding the possession, transportation, or distribution of marijuana or laundering drug proceeds, whether such communications be a telephone call, text message (e.g., SMS or MMS), instant message, audio message, video message, or communication through an application stored on the **Subject Devices**;

d. images or videos of drugs;

e. records detailing the types, quantity, and prices of drugs as well as dates, places, and amounts of specific drug-related transactions;

f. information related to the sources of drugs, including: names, addresses, phone numbers, or any other identifying information;

g. information related to the planning and coordination of transporting drugs or laundering drug proceeds;

h. audio recordings, pictures, video recordings, or still-captured images on the **Subject Devices** related to the purchase, sale, transportation, storage, or distribution of drugs or the collection, transfer, or laundering of drug proceeds;

i. bank records, checks, credit card bills, account information, and other financial records;

j. records, including internet usage history, related to drug trafficking, including package tracking, electronic or internet mail communications, and electronic payment receipts;

k. location data related to the acquisition, transportation, or distribution of drugs or the transfer of drug proceeds;

l. evidence of user attribution showing who used or owned the **Subject Devices** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, associated accounts, documents, and browsing history:

    i. records of Internet Protocol addresses used;

    ii. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

    iii. photographs, logs, phonebooks, saved usernames and passwords, and documents;

m. contextual information necessary to understand the evidence described in the attachment.

As used above, the terms "records" and "information" include the foregoing items of evidence in whatever form and by whatever means they may have been created or stored on the **Subject Devices**.